In the other case the verdict stated the land to be worth at the time of the purchase, in 1796, £ 200, and at the time of finding, £ 750, including improvements.
The question we are called upon to decide in these cases is whether, upon an eviction, the seller of land is responsible, under his warranty, to damages to the amount of the increased value from the time of sale, and consequently for the improvements made on the premises, or whether he is bound to pay the purchaser only the value of the property at the time of sale. The British authorities do not furnish any direct decision upon this subject in relation to the action of covenant; and that it is not easy to deduce from any analogy they afford the correct rule of adjudication is proved by the diversity of opinion prevalent in the American tribunals where the question has occurred. It has been investigated by learned and laborious counsel, and illustrated by the researches of judges of the highest order of intellectual excellence; yet in Massachusetts, Connecticut, and South Carolina the rule is to allow the value at the time of eviction; in New York, Pennsylvania, and Virginia the value of the land at the time of purchase forms the measure of damages.
Equal difficulty, it is probable, was experienced on this subject (88) in first laying down the principles of the civil law, a system generally characterized by its intrinsic excellence, and by being founded in many respects on the just grounds of rational jurisprudence. An arbitrary rule was resorted to, which limited the damages to double the value of the thing sold; but the avowed principle which gave rise to the rule was not to bind the parties beyond what they might reasonably expect the damage to amount to from the nonperformance of the contract. The principle itself is certainly conformable to natural equity, although the *Page 70 
rule built upon it seems better calculated to put an end to strife and uncertainly than to reach the merits of particular cases.
Indeed, we cannot hope that the practical application of any rule will obviate all inconvenience and injustice, whether the damages be referred to the time of sale or to the time of eviction. But mature consideration has convinced us that to allow the purchaser the original value of the land has the strongest sanction from legal analogy, is most consonant to the mild and temperate spirit of the common law, and less likely to produce public inconvenience or individual mischief than any other rule we could adopt.
The latter consideration, it is true, ought never to influence in decision in cases where the law speaks a clear and explicit language; but no one will deny that it merits the highest attention where neither scale of legal reasoning preponderates.
The only remedy by the ancient law for a person claiming under a warranty was the writ of warranted chartaoe, in which land itself was recovered equal in value to the land sold at the time of sale.
There is no variance in the books upon this point. In a warranty to the feoffee made by the feoffor, if upon voucher special matters be shown by the vouchee, that when he entered into the warranty the land at the time of the feoffment was worth only £ 100, and now at the time (89) of the voucher it is worth £ 200 by the industry of the feoffee, the plaintiff in a warranted chartaoe shall recover only the value as it was at the time of sale. Jenk Cent, 35.
If feoffor improve by buildings, yet dower shall be as it was at the seisin of the husband; for the heir is not bound to warrant except according to the value as it was at the time of the feoffment, and so the wife would recover more against the feoffor than he would recover in value. Co. Litt., note 193.
The leading cases on this subject are copiously and elaborately stated by Mr. Luther Martin in an opinion given by him, to be found in that useful work, Mr. Hall's Law Journal.
The warrantia chartaoe, which was a mixed action, calling for judgment on the warranty as well as for damages, has given place to the action of covenant, which pledges the personal as well as the real assets to the performance of the covenants. In this respect the remedy is more effectual and obligatory than the ancient one; but there does not seem to be any adequate reason for adopting a different rule of compensation.
The real intention and honest understanding of the parties ought always to be considered in expounding and enforcing their contracts. Nothing could be more unreasonable than to interpose a mode of computing damages which in all probability was not contemplated by either of the *Page 71 
parties at the time of contract, and which, if then brought into view, would have prevented its completion.
It is certainly repugnant to our ordinary conceptions of justice that a person who sold land of little worth a few years ago, which now, by cutting a canal or other expensive improvements, hath increased in value beyond all reasonable anticipation, should be liable to the purchaser to the full amount at the time of eviction. It would be doing violence to the spirit and general course of such transactions, to imagine that the seller, at least, calculated upon such a result. He has no control over the conduct of the purchaser, who may conduct his improvements in any manner, and push them to any extent which (90) views of profit, pecuniary ability, taste, or caprice may suggest.
A wealthy man may purchase from one in moderate circumstances a spot of ground on which he expends large sums of money, either with the view of commercial profit or in the gratification of a luxurious and costly rage for improvement; and thus, when the defect in title is discovered, the property is of greater value than the seller is able to pay. That the property should increase in value, and that the purchaser should improve it, were circumstances which might have been reasonably expected by the seller; but it is difficult to believe that he should, for an insignificant consideration, have calmly calculated upon the total ruin of himself and family in the possible event of a future eviction of the purchaser.
The truth is that in fair sales (and to such alone can the rule now established apply), both parties have a confidence in the goodness of the title. The seller possesses no knowledge concerning it which is not equally accessible to the buyer, who receives a warranty that in the event of the title proving defective he may be restored to the situation he would have been in had he never purchased. If, according to the common apprehension of mankind, the purposes of a warranty were more extensive than this, if its design were to indemnify the purchaser for the loss of his bargain, and the value of his improvements, would it not be customary to require something more than the security of the deed when it was intended to incur great expense in improvement?
Let the title continue unimpeached, the increasing value of the property is the gain of the buyer; the seller can claim no addition to the price. But if the title prove defective, the buyer will still recover the value of the land as it was when he purchased, although it may be diminished at the time of the eviction. In both cases the same rule of compensation should be applied.
Many cases have been stated, and may again be adverted to, which demonstrate the extravagant hardship of a contrary rule. *Page 72 
(91) Land is sold for a small price, on which, before eviction, a gold mine may be discovered, as in Cabarrus County; a flourishing town may be erected on it, as is the case in many parts of the State: or it may become unexpectedly valuable for agricultural purposes, by being connected with a navigable stream, of which an instance occurs in that immense body of land lying on Lake Phelps, and which, before the canal was cut connecting it with Albemarle Sound, was held in comparatively small estimation. Indeed, without any extraordinary means of improvement the increase in the value of lands in many parts of the State has been so great and rapid as to baffle calculation and deceive foresight.
Those who are conversant with courts of justice know that the early patents produced on trials in some parts of the State have studiously left out lands then deemed of no value (not worth the taxes) which now, by drainage, or in some instances by the increased evaporations from clearing the grounds, have become the most productive.
Any other rule of computing damages than that of the value at the time of sale would, in our opinion, produce the most glaring injustice and the widespread ruin and impoverishment of families. Nor is the principle varied because the jury, in one of these cases, have found that the increased value of the land arose from the ordinary and regular rise of property. Some rule must be established as a guide to the community; for it would produce endless inconvenience to constitute the jury chancellors in each particular case, and it is impossible to take any intermediate period between the sale and eviction.
We have adopted that which refers to the sale from a belief that if the authorities do not amount to precise demonstration on the point, they at least raise a strong probability that the law is so; and because such rule appears to us equitable, rational, and most consonant to the views and understanding of the contracting parties.
NOTE. — See Dickens v. Shepperd, 7 N.C. 526; Williams v. Beeman,13 N.C. 483; Grist v. Hodges, 14 N.C. 198.
Cited: Wilson v. Forbes, 13 N.C. 39; Williams v. Beeman, ib., 487;Gant v. Hunsucker, 34 N.C. 257. *Page 73 
(92)